May it please the Court. My name is Nancy Bergeson and I represent Michael Held in connection with this appeal. The issue before this Court this morning really touches core values of the Fourth Amendment and Fifth Amendment and circles around whether or not the police in the street can extend those into a home. Here in this case the police went into a home to get a gun. They did not have a warrant. There was no exigency or emergency. There was no public safety exception. This isn't really a home in the ordinary sense is it? A motel is afforded the same degree of protection as a home and it was indeed Mr. Held's home. How about the need for protecting the adjacent homes right across the hall? Room 11 seems to be awfully close to room 12. Well, Your Honor, by the time that police came to the home, Mr. Held had indeed been banging at the door next door to where Mr. Held was residing. And he was taken into the parking lot not far from the door, probably only about 20 feet from the door from the room 12, which is where Mr. Held was. And at that time there was no evidence of altercation. There was no, apparently no contact with the person inside room 11 other than the previous 911 call. And police had simply been in conversation with that individual who had been pounding the door next door. The public safety exception, and I'm focusing on a public safety exception, which is to be distinguished from an emergency or an exigency, there are certain very definite requirements. There has to be a nexus between the place to be searched or entered and the danger. And if you're talking about two different motel rooms, even though they are adjacent, there doesn't seem to be that requisite nexus. And I refer the Court to the case of Martinez, which is discussed in my brief, and talks about the emergency doctrine as well as exigency. Now, again, that's a little bit different. But essentially Can I ask you this? Confronted with the situation where there's been a 911 call saying that there's a man with a gun, the policeman shows up at the motel, he sees someone sitting on the bed in the room from which it's reasonable to assume that's where the gun had been, what in your view is the policeman supposed to do? I think there are a number of things the policeman can do. If the policeman is persuaded by the complainant's account that it's credible, perhaps the policeman has probable cause, in which case a warrant could be obtained. Perhaps the policeman also has... Now, what do you mean a warrant could be obtained? Either to arrest or to search. A telephonic warrant could be obtained to search room 12 based on the account of the complainant, based on the officer's ability to corroborate those statements. Alternatively, the policeman can certainly ask Mr. Held to depart the room and then have a consensual conversation with him. There are a number of alternatives available to the police officer, short of seizing, effectively seizing and entering under those circumstances. Short of asking him, do you have a gun, which is basically what he did. I mean, the district court says he did not have his gun, concluded that he does not have his gun drawn, and for the moment I will assume that that's correct. So he sees this young man in the room and says, do you have a gun? He's not supposed to ask that question? Your Honor, no. Not under these circumstances. I think that's the difficulty when you're talking about a home, the guarded, the absolute protection afforded a home. He didn't even knock on the door. The door is open. He sees this young man. He's supposed to say, would you please step out? As I say, I think there are a number of alternatives. Where the courts have said that the public safety exception can be carved out are very narrow. And I'll give the court the example of the two cases that have been cited by the government here, New York v. Quarles and also where the court said there is a public safety exception to the Miranda requirement in these cases that we're prepared to recognize. In Quarles, it was a circumstance where a woman had been raped. Police were in pursuit of the man who matched the description. They were absolutely entitled to find him, frisk him. When they found the empty holster, ask him, where's the gun? Ms. Bergson, you know, you seem to have jumped right into this public safety exception without even touching on, and then in the course of it, you seem to be addressing the Miranda issue, but without even addressing whether or not he was in custody. I agree. The court must find the issue. Are you assuming that he was in custody? I take the position that he indeed was in custody. Why? And there are facts and circumstances of this case. He was in his own room and the policeman was standing at the door. That puts him in custody? Without his gun drawn? If we know, as we look at the circumstances here, yes. The courts have a series of factors that they consider. United States v. Kim is the case that I have relied on that sets out those factors. What the courts look at is the language used to summon the person, the extent to which the person is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention, and degree of pressure. If you apply those factors to this case, given the nature of this accusatory questioning out of the gate, it is pinpointed, the officer demands, did you point a gun at this person? Where is that gun? Can I go get the gun? This is not a case where many of them are where a person voluntarily undertakes to accompany the police to the station house. What would be an appropriate question to ask, or was there no appropriate question for the police officer to ask? Does he have to start out by saying, I want to read you your Miranda rights, or what? I think that the appropriate course of action would be to say what the police officer said in Cormier, which is a case that I cite dealing with the consensual encounter, which is, Mr. Held, I'd like to talk to you. Would you come out here with me? May I come into your motel room? And then you have a consensual encounter, which is fully legitimate under Cormier. I suppose Mr. Held would say, frankly, I'd rather stay alone. Why don't you come back later? What does the officer then do? Then I think the police officer has to gauge what his options are. We cannot do, under the case law, a terry stop at a home. And I've pointed out the cases that don't authorize that kind of a stop. We can't arrest people in their home without a warrant, without an exigency. And we can't go into a home against somebody's wishes if we don't have a legitimate exception to the warrant requirement. And a home is not a different entity when it's a kind of multiple dwelling, which one might say a motel was? Seems to me a different sort of home. The Fourth Amendment absolutely, and the courts and the United States Supreme Court has recognized that a motel room is a person's home. It is considered a home. It's afforded the same degree of protection. And that's the promise here. There is no lesser degree of protection. There is no greater right to an intrusion into a motel by law enforcement than there would be to your home. This is Mr. Held's home. And that's really the crux of this case. At what point are we going to say, no, we're going to dispense with those protections even though we don't have an exigency, we don't have a public safety exception, even though we don't have consent here, and we don't have a warrant? If we had a circumstance like these cases, Quails and Allen v. Roe, then you could. You could find a public safety exception. And I think my time is up. If I'd like to say, may I be excused? I probably should wait. Well, let's hear from the other side, and we'll make sure you have enough time to rebut. All right. Thank you. Good morning, Your Honors. Frank Noonan for the government, and it pleases the Court, Ms. Bergeson. I have just a brief argument, Your Honor. This case begins on April 22nd of 2003, and I think the Court is very well aware of the facts, so I won't recite them at any great length. When Officer Pierce gets a radio call, first because of a disturbance, then that's amplified somewhat to include a weapon. He goes to the motel room, drives to the motel room. As he arrives there, gets out of his car, he sees Mr. Kinsler, who is the victim witness, if you will, the man at whom the gun has been pointed. At that point there, 20 to 30 feet – excuse me, Your Honor, I can tell you have a question. No, I'm listening. I'm sorry. I misread you. 20 to 30 feet from an open door, Mr. Kinsler points to the defendant. That's the man who pointed the gun at me. Officer Pierce then approaches the door, and I think the record indicates as Officer Pierce is walking toward the open door and he can see the defendant, the defendant rises from the bed and they meet essentially at the doorway. The questioning is, as Officer Pierce described at least, rather cordial. This isn't a scene where he has a gun drawn, where he's being violent or displaying any – It isn't a scene where he has a gun drawn? Pardon me, Your Honor. You say it's not a scene in which the officer has a gun drawn? That was Judge Reddin's finding and the officer testified. Is that a supportable – I simply couldn't recall. Is that a supportable finding? Yes, I think it is, Your Honor. I think – Where the only testimony is, I don't know whether I had a gun drawn or not? Well, there was no contrary evidence, Your Honor. I think that's disputable, but certainly I think the overall context of that encounter is not one that would require or allow this court to find against Judge Reddin that there was an unusual display of – Wouldn't it have been on the burden on the government's part to show that with respect to that issue that there was no gun drawn? I think the court received the best evidence we had, if that's a fair response. I don't think the officer did recall. I admire the district judge in this case. I will tell you, I think I would have found it quite difficult to make a finding one way or another on the basis of that testimony. Well, I don't know that I can dispute that too much with you. The officer simply said he didn't recall, and on those facts, the district court judge, Judge Reddin, found that a gun wasn't displayed. But I think, Your Honor, even – Suppose the district judge had found the other way. You would not have challenged that finding? I might have, whether I would have won or not. That's a hypothetical. It's irrelevant, isn't it? I never know, but – In any event, the finding that he did make has not been challenged on appeal, right? That's correct. So, Your Honors, then once they meet at the door, Officer Pierce asks, I believe, just a couple of questions. And the first question is about, did you point the gun? The response, I don't think, was no. The response, I think, was, well, not really. And Officer Pierce then says, well, come on, or be honest, or something like that. The defendant says, yes, I did point the gun. Where is the gun? It's in there under the So up to that time, the officer was standing at the doorway? Yes, Your Honor. All right. I think the immediate confrontation is at the doorway, and then permission is given. The officer goes inside. So he didn't go into the room until after the defendant said, yes, you can come in. That's correct, Your Honor. I think what the record would demonstrate is that the question is asked, and then the defendant then says yes. And I think the officer testified that he stepped aside or moved. He walked in. But I think, clearly, there was no effort on the defendant's part to resist. So the government's position is, one, that this is not, as to Miranda, that it's not custodial. And then, with respect to public safety, that the officer was entitled to go in and seize the weapon. And with respect to the consent, that this was not custodial, that there was no unusual display of force, nothing that would overcome a citizen's rights to protest. It's not in custody? And Mr. Held was free to go and would have known that? I think, Your Honor, under the Booth analysis, that a reasonably innocent person would not have felt his liberty was restrained at that point. Or a reasonably guilty person. Why? Well, guilty, that might change it. But I think this Court's analysis of that You think a reasonable person, guilty or not, in that situation, would have felt free to, you know, get up off the bed, go to the door, and say, excuse me, officer, I want to be alone, and shut the door? Do I think a reasonable person would have done that, Your Honor? Would have felt free to do that. I don't think so. Do you? Well, you know, let me try to answer that as just as candidly as I can. I think in any confrontation with a police officer, there's going to be some sort of reticence on the part of a citizen to do that kind of thing and just walk away. But I think under this Court's analysis, under the question of whether it is custodial, yes, I think a reasonably innocent person in those circumstances would have felt Why do you keep inserting reasonable innocent person? Isn't it reasonable person? I think, Your Honor, that's the language of this Court's cases, including Booth. That's a part of the analysis. So we can go back, figure out later that he's guilty, and say, well, the test doesn't apply to you because you weren't innocent? Well, I have always read that language in the Court's opinion to distinguish between an innocent person and a guilty person in the sense of what kind of a reaction the officer's going to take. And obviously, that would be different. Someone with consciousness of guilt knowing would probably react to a police officer very differently than an innocent person. And I think that makes sense. And I think that's a part of this Court's analysis. So the police officer is there at the door of the motel room. And the question is whether a reasonable person, whether reasonably innocent or reasonably to go. Well, go literally means, says, you know, I'd like to leave now. Get out of my way. I'm leaving. And he closes the door and he walks down to the 7-Eleven. But I guess in this circumstance, free to go also means, as Judge Teshima suggests, please step back so I can close the door. I would like to be alone. And you're saying that a reasonable person would feel free to do that with a police officer standing in the door asking questions? I think a reasonable person would have done that. Yes, Your Honor, I do. I don't know any reasonable person who would have. There was no display of force. There was nothing unseemly overbearing about what the officer did. He approached to ask questions. Now, I think implicit in the Court's questioning is would any citizen confronted by a police officer simply feel some constraint? And sure, we try to answer questions. But under these circumstances, there was nothing that the officer did that would have indicated to the defendant at this point. Other than standing in the door. He's standing in the door. Asking questions. He just goes and stands in the door and says, hey, did you point a gun at somebody? You know, the more you push the notion that there was no custody here, if that's critical to your argument, the more that leads me to think that, gee, I'd like to send the case back to the district judge to rethink the question of whether there was a gun in the officer's hands. Whether there weren't other witnesses who might be able to give testimony on that. Well, of course, that's a decision for you. I'm not sure that your argument ultimately requires you to pursue the custody issue. I don't think, Your Honor, that even had the police officer said, I got there. I heard that there was a gun involved. I could see into the room. I couldn't see his hands, maybe. I walked in. Yes, I did draw my weapon. But that, without more, would have made custody. I don't think that would have been that critical. Well, you know, except for this. You see, this is what bothers me about this case in terms of, you know, being free to feel free to walk away.  in an airport or somewhere out in the public where a person could just turn around and leave. But here, you see, the only, presumably, the only exit from the motel room is through the doorway that the officer was blocking. So, you know, the person couldn't leave without pushing the officer aside, and certainly that would be harder to do if he had a gun drawn, right? In other words, he was not free to leave because the only exit was blocked by the police officer. Well, Your Honor, I would So it's different, you know, from the encounter in the public area. I would, well, number one, Your Honor, I would respectfully disagree with the Court that there's evidence that he was not free to leave. But secondly, this is not that different than this Court's analysis in the Cormier case, which involves the knock and talk of a police officer going there specifically to a motel room. The identical kind of confrontation. And if I could return for a moment to Judge Fletcher's original comment, what would we expect a police officer under these circumstances to do? What realistic guidance can we give to a police officer? And I think this Court has traditionally looked toward display of force, toward some untoward. Here, we have a police officer going essentially to a man with a gun call. He walks up to the door. He says, did you point the gun? And the defendant says, yes. Can I have it? Yes. There's a voluntary consent, and I'm now well into it. No. Okay. Thank you very much, Your Honor. Thank you very much. You've saved some time for rebuttal. Thank you. I know I don't have long. Well, listen, we will hear you out, so say what you need to say. All right. I'd like to pick up with just this last thing that the Court was talking to the Governor about. Cormier is exactly the kind of circumstance showing a consensual encounter. And all of the factors in Cormier are not present here. We have two officers. They are uniformed, and they are visibly armed. Whether or not an officer actually pulls a gun is probably a risk. Did Mr. Hill testify at this suppression hearing? He did not. He did not. Was he present in the room? He absolutely was, yes. And this was a suppression hearing, so he could have testified without endangering himself for having sort of waived his Fifth Amendment self-incrimination rights? Certainly. Facts didn't require it, though. The facts here are strong. Well, I'm trying to get at the question of whether the gun was drawn. That is to say, if he wanted to get up and say the gun was drawn, he could have done so. A defendant always can take the witness stand. Right. But in this case, the officer's testimony was that he possibly had drawn one. But still, the case is finding and detention. Washington or Haragi that I cite by comparison don't have an officer drawing a gun. What they have is an air of police presence that compels cooperation. So there may be a number of officers. They're uniformed. They visibly have a gun. They are in the physical proximity of the defendant, not allowing him to leave so that he's feeling some degree of pressure. You don't need force. And the government's argument has been you need some degree of force or coercion. Cop, the United States Supreme Court case that I cite dealing with acquiescence, says precisely that. The defendant doesn't need to object and say, no, wait, you can't do this, to preserve his Fourth Amendment interests. And so I thank you. Okay. Thank both of you for a useful argument. The case of United States v. Held is now submitted for decision. The next case on the calendar has been submitted on the briefs. That's United States v. Guerreri. The next case on the argument calendar is McCracken v. Lockwood School District. Thank you.
judges: Tashima, W. Fletcher,, Pollak